Clara MARKS et al., Appellants,

v.

CITY OF ANCHORAGE, and John C. Flanigan, in his capacity as Chief of the Anchorage City Police Department, Appellees.

No. 1568.

Supreme Court of Alaska.

June 23, 1972.

Rehearing Denied Sept. 15, 1972.

Alan G. Sherry, Alaska Legal Services Corp., Anchorage, for appellants.

John R. Spencer, City Atty., John Van Winkle, Asst. City Atty., for the City of Anchorage.

Before BONEY, C. J., and RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

ERWIN, Justice.

Appellants, as individuals and as representatives of a class under Civil Rule 23(a), brought this action seeking to have a "disorderly conduct" ordinance of the City of Anchorage declared unconstitutional on its face. The ordinance, enacted on May 26, 1970, provides as follows:

It shall be unlawful for any person with purpose and intent to cause public inconvenience, annoyance or alarm, or recklessly create a risk thereof by:

(1) Engaging in fighting or threatening, or in violent or tumultuous behavior; or

(2) Making unreasonable noise or offensively coarse utterance, gesture, or display, or addressing abusive language to any person present; or

(3) Lodging in cars, grocery stores, washrooms, sheds, or other places other than such as is kept for lodging purposes, without the permission of the owner or party entitled to possession thereof.

(4) 'Public' means affecting or likely to affect persons in a place to which the public or substantial group has access; among the places included are highways, streets, transportation facilities, schools, prisons, apartment houses, places of business or amusement parks or any neighborhood.[1]

In their amended complaint appellants allege that they are members of a class of long-haired, indigent, unemployed and generally unconventional persons, as well as low-income native persons, who, because of their non-conformist lifestyles, are subject to special scrutiny by the police. They state further that they engage or desire to engage in various constitutionally protected activities and associations which are proscribed by the ordinance, and argue that the ordinance is unconstitutionally overbroad and so vague as to violate the due process guarantee.[2]

The superior court judge entered partial summary judgment in appellants' favor holding:

1. That the phrases 'unreasonable noise' and 'gesture and display' as used in § 15–1(mm) (2) of the Code of Ordinances of the City of Anchorage, Alaska, are declared unconstitutional on their face, and that defendants and their agents are enjoined from the enforcement of said provisions;

2. That the remaining portions of § 15–1(mm) of the Code of Ordinances of the City of Anchorage, Alaska, are declared constitutional on their face, and that plaintiff's cause as to these remaining portions of Ordinance 15–1(mm) is dismissed.

Appellants argue on appeal that the validated portion of the ordinance is also unconstitutionally vague and overbroad. The City of Anchorage has not appealed from the superior court's decision and has declined to file a responsive brief before this court.

1. Ordinance 17–70 § 1, codified as § 15–1 (mm), Anchorage Code of Ordinances (1970).

2. U.S.Const. amend. I provides:
   Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.
   U.S.Const. amend. XIV, § 1 provides in part:

[N]or shall any state deprive any person of life, liberty, or property, without due process of law;
Alaska Const. art. I, § 5 provides:
   Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.
Alaska Const. art. I, § 6 provides:
   The right of the people peaceably to assemble, and to petition the government shall never be abridged.
Alaska Const. art. I, § 7 provides:
   No person shall be deprived of life, liberty, or property, without due process of law.

We have concluded that the ordinance is unconstitutional in its entirety. As will appear below, the ordinance contains language that the United States Supreme Court has specifically declared to be impermissibly vague and overbroad in a series of opinions, some of which pre-date the ordinance by several decades. Further, although some of the conduct prohibited by the ordinance is constitutionally reachable, the ordinance must be struck *in toto* because the prefatory language setting out the mens rea for the entire ordinance is impermissibly vague and thereby infects its otherwise valid portions.[3] Because of the critical importance of these constitutional principles in protecting the fundamental liberties of our citizens and because this is a case of first impression in Alaska, we will examine these precepts of constitutional law in some detail.

Although the overbreadth and void-for-vagueness doctrines are related and, at least in the first amendment area, not wholly separable,[4] they are functionally and doctrinally distinct. The overbreadth doctrine has evolved to give adequate breathing room to specific first amendment freedoms; a statute violates the doctrine when constitutionally-protected conduct as well as conduct which the

state can legitimately regulate are included within the ambit of the statute's prohibition.[5] By contrast, specific constitutional guarantees are not necessarily implicated when a statute is declared void for vagueness. The latter doctrine comes into play when the statutory language is so indefinite that the perimeters of the prohibited zone of conduct are unclear; a statute may be unconstitutionally vague even though no activities specifically protected by the Constitution are outlawed.[6] A vague statute violates the due process clause both because it fails to give adequate notice to the ordinary citizen of what is prohibited and because its indefinite contours confer unbridled discretion on government officials and thereby raise the possibility of uneven and discriminatory enforcement. As appellants point out, the ordinance now before this court raises the spectre of all of these abuses: it prohibits conduct which is protected by the United States and Alaska constitutions, it fails to give adequate notice of what conduct is prohibited, and it gives enforcement officials excessive discretion.

Turning first to the overbreadth infirmity, in N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (1963), the United States Supreme

---

3. Not only is the prefatory language vague, but, as we point out later in this opinion, when applied to subsections (1) and (2) of the ordinance to reach constitutionally protected activity, it is overbroad. *See* discussion of Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), *infra*.

4. *See* Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 845, 871–75 (1970); Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67, 110–13 (1960).

5. *See generally* Amsterdam, Federal Constitutional Restriction on the Punishment of Crimes of Status, Crimes of General Obnoxiousness, Crimes of Displeasing Police Officers, and the Like, 3 Crim.L.Bull. 205, 224–26 (1967); Note, The First Amendment Overbreadth Doctrine, note 4 *supra*.

6. *See generally* Freund, The Use of Indefinite Terms in Statutes, 30 Yale L.J. 437 (1921); Aigler, Legislation in Vague or General Terms, 21 Mich.L.Rev. 831 (1923); Freund, The Supreme Court and Civil Liberties, 4 Vand.L.Rev. 533, 539–40 (1951); Collings, Unconstitutional Uncertainty—An Appraisal, 40 Cornell L.Q. 195 (1955); Scott, Constitutional Limitations on Substantive Criminal Law, 29 Rocky Mt.L.Rev. 275, 287–89 (1957); Amsterdam, note 5 *supra*; Note, Due Process Requirements of Definiteness in Statutes, 62 Harv.L.Rev. 77 (1948); Note, Constitutional Law, Void for Vagueness: An Escape from Statutory Interpretation, 23 Ind.L.J. 272 (1948); Note, The Void-for-Vagueness Doctrine in the Supreme Court, note 4 *supra*; Note, Breach of the Peace and Disorderly Conduct Laws: Void for Vagueness? 12 How.L.J. 318 (1966); Note, 35 Alb.L.Rev. 391 (1971).

Court articulated the rationale for the overbreadth doctrine:

> These [first amendment] freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently· as the actual application of sanctions. . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.

Because of the "chilling effect" that overbroad laws have on the exercise of constitutional rights,[7] the court emphasized that broad prophylactic rules are suspect and "[p]recision of regulation must be the touchstone . . . ." *Id.* at 438, 83 S.Ct. at 340, 9 L.Ed.2d at 421.[8]

■ As we.noted in Anniskette v. State, 489 P.2d 1012, 1013 (Alaska 1971), it is only in the most limited circumstances that speech can be punished.[9] For example, erotic speech might be punished as obscenity if the tests promulgated by the Supreme Court are met.[10] Similarly, a person may be punished for uttering "fighting words" which are likely to provoke a violent reaction when addressed to an ordinary citizen[11] or for intentionally provoking a crowd to hostile reaction under circumstances where a clear and present danger of immediate violence exists.[12] Presumably a state could also limit speech or assembly in specific places under limited circum-

stances, as, for example, in a courtroom while the court is in session.[13] But a careful look at the relevant Supreme Court cases makes it obvious that the Anchorage ordinance lacks the requisite specificity and stretches far outside the area of permitted regulation.

In Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), the Supreme Court struck down a breach of the peace ordinance as applied to petitioner who had delivered an inflammatory speech to an unruly crowd. The jury was instructed that the language, "breach of the peace", included speech that "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance." *Id.* at 4, 69 S.Ct. at 895, 93 L.Ed. at 1134. After noting that the vitality of our civil and political institutions depends on free discussion, the Court stated:

> [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, . . is nevertheless protected against censorship or punishment, *unless shown likely to produce a clear and present danger*

---

7. *See* Keyishian v. Board of Regents of University of New York, 385 U.S. 589, 604, 87 S.Ct. 675, 17 L.Ed.2d 629, 641 (1967). *See also* Note, The First Amendment Overbreadth Doctrine, note 4 *supra*, at 852–58.

8. *See also* N.A.A.C.P. v. Alabama ex rel. Flowers, 377 U.S. 288, 307–308, 84 S.Ct. 1302, 12 L.Ed.2d 325, 338 (1964); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231, 237 (1960).

9. Anniskette was convicted under a state breach of the peace statute, AS 11.45.030, that is strikingly similar to the Anchorage ordinance. Since we held that Anniskette's conduct was specifically protected by the first amendment however, we did

not reach the broader question of the statute's constitutionality.

10. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) and its progeny.

11. Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

12. *See* Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951). *Cf.* Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).

13. *Cf.* Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284, 290 (1971); Edwards v. South Carolina, 372 U.S. 229, 236–237 and n. 11, 83 S.Ct. 680, 9 L.Ed.2d 697, 702–703 (1963).

*of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. * * * There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.* (emphasis added)

*Id.* at 4–5, 69 S.Ct. at 896, 93 L.Ed. 1134–1135. To emphasize the obvious, *Terminiello* held that "public inconvenience, annoyance or unrest" is an insufficient evil to justify punishing speech. In subsections (1) and (2) the Anchorage "disorderly conduct" ordinance prohibits various constitutionally protected expressive activities done with intent to cause "public inconvenience, annoyance or alarm." Since the Supreme Court has never diluted its *Terminiello* holding,[14] we can only conclude that the overbreadth of these portions of the Anchorage ordinance is as clear today as it would have been in 1949.[15]

In Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), 187 persons who demonstrated at the grounds of the state legislature engaging in what the city manager described as "boisterous", "loud" and "flamboyant" conduct were convicted of breach of the peace, "an offense so generalized as to be, . . 'not susceptible of exact definition.'"[16] *Id.* at 237, 83 S.Ct. at 684, 9 L.Ed.2d at 703. The court quoted the language cited above from *Terminiello* and struck down the statute as an overbroad interference with the rights of free speech, free assembly, and freedom to petition for redress of grievances. Last term in Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), the Supreme Court declared void on its face a Cincinnati, Ohio, ordinance which made it a criminal offense for "three or more persons to assemble . . . on any of the sidewalks . . . and there conduct themselves in a manner annoying to persons passing by . . . ." The following statement by Justice Stewart for the Court is directly applicable to the case at bar:

> Our decisions establish that mere public intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms. . . . The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people. If this were not the rule, the

14. *See* Edwards v. South Carolina, 372 U.S. 229, 237–238, 83 S.Ct. 680, 9 L.Ed. 2d 697, 703 (1963). *See generally* Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

15. Terminiello's speech, held protected by the Court, would undoubtedly be considered "abusive", "tumultuous" and "threatening" under the Anchorage ordinance: Terminiello called Eleanor Roosevelt a communist, referred to the "Morgenthou plan for the starvation of little babies and pregnant women in Germany", castigated "atheistic Communist Jews", and other non-Christians "slimy scum", and warned that "there will be violence." *See* Terminiello v. Chicago, 337 U.S. at 17–22, 69 S.Ct. 894, 93 L.Ed. at 1140–1141 (Jackson, J., dissenting).

16. The Court noted that the state court had defined breach of the peace in the following terms:
> 'In general terms, a breach of the peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence . . . , it includes any violation of any law enacted to preserve peace and good order. It may consist of an act of violence or an act likely to produce violence. It is not necessary that the peace be actually broken to lay the foundation for a prosecution for this offense. If what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace, no more is required. Nor is actual personal violence an essential element in the offense. . . .
> 'By "peace," as used in the law in this connection, is meant the tranquility enjoyed by citizens of a municipality or community where good order reigns among its members, which is the natural right of all persons in political society.'
> 372 U.S. at 234, 83 S.Ct. at 683, 9 L.Ed. 2d at 701.

right of the people to gather in public places for social or political purposes would be continually subject to summary suspension through the good-faith enforcement of a prohibition against an annoying conduct. And such a prohibition, in addition, contains an obvious invitation to discriminatory enforcement against those whose association together is 'annoying' because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens. (footnotes omitted)

402 U.S. 611, 91 S.Ct. at 1689, 29 L.Ed.2d at 218. Likewise, this term the Court voided a Georgia statute which made it a crime to use "opprobrious words or abusive language, tending to cause a breach of the peace . . . . " Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 1104, 31 L.Ed. 2d 408 at 415 (1972). The Court noted that a conviction under the statute could be upheld only if it were "not susceptible of application to speech, [although vulgar or offensive,] that is protected by the First and Fourteenth Amendments . . . . "

*Id*. 92 S.Ct. at 1110, 31 L.Ed.2d at 413. The Court noted that while speech which has a direct tendency to cause immediate acts of violence is not protected, the statutory words "opprobrious" and "abusive" encompass, *according to Webster's dictionary*, language that merely conveys disgrace or is harshly insulting.

The Anchorage ordinance prohibits "threatening and violent or tumultuous behavior", "unreasonable noise", "abusive language" and "offensively coarse utterances, gestures or displays" when motivated by an intent to cause "public inconvenience, annoyance or alarm." Reference to Webster's International Dictionary indicates that the ordinance thereby makes it a crime for one, with intent to cause public embarrassment, uneasiness, annoyance, discomfort or fear, to engage in conduct that is noisy, disorderly, causing or evi-

dencing mental or emotional excitement, or, with like intent, to use language that is vulgar, indelicate, distasteful, insulting or reproachful. Neither the federal nor Alaska constitutions will permit such a broad and arbitrary interference with freedom of speech. Public life in our democracy would be robbed of its vitality and our citizens soon lose their self-confident independence of thought if such an ordinance were enforced to eliminate any mode of speech not acceptable to the most squeamish of our citizens. As Justice Douglas noted in *Terminiello*, a function of free speech in our system is to *invite* dispute and the constitutional guarantee sometimes best serves its purpose when speech creates dissatisfaction with existing conditions and stirs citizens to anger. 337 U.S. at 4–5, 69 S.Ct. 894, 93 L.Ed. at 1134–1135. We resolve the issue before us against the "background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," [17] the drafters of our constitution concluded long ago that our nation is most likely to flourish by selecting direction from a multitude of voices engaged in vigorous debate rather than from authoritative selection by government officials.[18]

An appreciation for the latitude commanded by the first amendment can perhaps best be obtained by a close reading of Justice Harlan's opinion for the Court in Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). There the Court held that Cohen could not, consistent with the first amendment, be criminally punished for appearing in a courthouse wearing a jacket bearing the plainly visible epithet "Fuck the Draft". Justice Harlan eloquently referred to the constitutional backdrop for decisions affecting expression:

The constitutional right of free expression is powerful medicine in a society

---

17. New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686, 701 (1964).

18. *See id*. at 270, 84 S.Ct. 710, 11 L.Ed.2d at 700.

as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests.

*Id.* at 293, 91 S.Ct. at 1787. He noted that the verbal tumult which resulted was a sign of strength and rejected the state's argument that, as guardian of public morality, it could excise offensive words from the public vocabulary:

[T]he principle contended for by the State seems inherently boundless. How is one to distinguish this from any other offensive word? Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below. For, while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual.

*Id.* at 294, 91 S.Ct. at 1788. We have little doubt that the phrase "Fuck the Draft" would be considered unreasonable, offensively coarse and abusive by many of our citizens.

19. *See generally* Amsterdam, note 5 *supra.* *See also* Harris v. State, 457 P.2d 638, 641 (Alaska 1969).

20. *See also* Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L Ed. 888, 890 (1939):

We therefore hold that those portions of subsections (1) and (2) of the Anchorage ordinance which could be applied to protected speech—"threatening", "tumultuous behavior", "unreasonable noise", "offensively coarse utterance, gesture, or display" and "addressing abusive language to any person present"—are unconstitutionally overbroad.

In addition, the Anchorage ordinance suffers from the related constitutional infirmity of vagueness. As noted above, the constitutional defect of a penal statute which does not clearly specify the contours of the prohibited conduct lies first in the failure of notice as to what conduct is punishable, and second in the fact that an unclear, variable standard of guilt raises the possibility of uneven administration.[19]

The vagueness doctrine is no recent innovation in constitutional law. In Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926), the Court articulated the lack-of-notice rationale in invalidating a penal statute:

That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.[20]

In addition, as Professor Amsterdam points out, the Supreme Court's concern that a vague statute will invite arbitrary

No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.

arrests and convictions has long been evident.[21] In Herndon v. Lowry, 301 U.S. 242, 263, 57 S.Ct. 732, 741, 81 L.Ed. 1066, 1077 (1937), the Court stated that a vague penal law "licenses the jury to create its own standard in each case"; in Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 742, 84 L.Ed. 1093, 1100 (1940), the Court noted that such a law could be used for "harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure."

Although a number of the vagueness cases, including *Thornhill,* involve first amendment issues and therefore also raise overbreadth issues,[22] Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed. 2d 447 (1966), and Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965), clearly establish that it is a distinct constitutional defect for a statute, by its vagueness, to sanction arbitrary administration by courts or law enforcement personnel. In *Giaccio* the Court struck a Pennsylvania statute which gave jurors unguided discretion to impose court costs on acquitted misdemeanor defendants. No first amendment issue was presented; the Court simply held that a statute so vague as to be virtually standardless could not be judicially enforced consistent with due process. In *Shuttlesworth,* a conviction under a Birmingham, Alabama, ordinance which provided that it was "unlawful for any person to stand or loiter upon any street or sidewalk . . . after having been requested by any police officer to move on" was reversed. Although first amendment issues lurked in the background (Shuttlesworth was a civil rights worker), the Court did not resolve the case on free speech or assembly grounds. The Court focused instead upon the possibility of arbitrary enforcement of the ordinance by police officers:

> Literally read, therefore, the second part of this ordinance says that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer of that city. The constitutional vice of so broad a provision needs no demonstration. It 'does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat.'

*Id.* 382 U.S. at 90, 86 S.Ct. at 213, 15 L.Ed.2d at 179.

Many comments have been made on the abuses to which vagrancy statutes, first cousins to the disorderly conduct laws of the type now before us, are put. Justice Frankfurter, dissenting in Winters v. New York, 333 U.S. 507, 540, 68 S.Ct. 665, 682, 92 L.Ed. 840, 862 (1947), stated:

> These statutes are in a class by themselves, in view of the familiar abuses to which they are put. . . . Definiteness is designedly avoided so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of police and prosecution, although not chargeable with any particular offense. In short, these 'vagrancy statutes,' and laws against 'gangs' are not fenced in by the text of the statute or by the subject matter so as to give notice of conduct to be avoided.

One commentator, in a comprehensive study of vagrancy, disorderly conduct and habitual drunkenness statutes, noted that such laws are utilized for such diverse purposes as banishing unwanted persons from the community, investigating persons suspected of past criminality, detaining persons thought likely to engage in future criminality, punishing affronts to police

---

21. *See* Amsterdam, note 5 *supra,* at 220–221.

22. *E. g.,* N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405, 418

(1963) ; Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

dignity and temporarily disposing of various problem-creating individuals such as alcoholics and the mentally ill.[23] In short, such laws function as the "garbage pail of the criminal law", a convenient dumping ground for perceived social ills thought to have no other immediate solution.[24]

In its last two terms, the United States Supreme Court has vigorously applied the vagueness doctrine to a number of these kinds of statutes. In Palmer v. Euclid, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971) (per curiam), the Court reversed a conviction under a "suspicious person ordinance" on the ground that appellant was not given sufficient notice of what was proscribed.[25] In Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), the Court held that an ordinance which made it a criminal offense for "three or more persons to assemble . . . on any of the sidewalks . . . and there conduct themselves in a manner annoying to persons passing by . . . ." was not only overbroad but also unconstitutionally vague. Since conduct that annoys some people does not annoy others, " 'men of common intelligence must necessarily guess at [the ordinance's] meaning.' " 91 S.Ct. at 1688, 29 L.Ed.2d at 217 (quoting from Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322, 328 (1926)). Likewise, in Gooding v. Wilson, 405 U.S.

518, 92 S.Ct. 1103, 31 L.Ed.2d 408 at 415, 417 (1972), the phrase "opprobrious words or abusive language" in a "breach of the peace" ordinance were held to be both overbroad and impermissibly vague. The most comprehensive vagueness case, however, is Papachristou v. Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), where Justice Douglas, writing for a unanimous Court, struck a Jacksonville vagrancy ordinance.[26] The Court explicitly recognized both rationales for the void-for-vagueness doctrine:

> This ordinance is void-for-vagueness, both in the sense that it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989, and because it encourages arbitrary and erratic arrests and convictions. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066.

When these fundamental and long-established principles of constitutional law are applied to the Anchorage ordinance, there is no escape from the conclusion that the ordinance is likewise void for vagueness. Since the prefatory language of the ordinance, containing the mens rea for the specifically enumerated prohibited acts, is itself impermissibly

---

23. Foote, Vagrancy-Type Law and Its Administration, 104 U.Pa.L.Rev. 603, 613–37 (1956).

24. *Id.* at 631.

25. The ordinance punished "[a]ny person who wanders about the streets or other public ways or who is found abroad at late or unusual hours in the night without any visible or lawful business and who does not give satisfactory account of himself." 91 S.Ct. at 1564, 29 L.Ed. 2d at 99–100.

26. The Jacksonville ordinance, a classic in the genre, provided:
   Rogues and vagabonds, or dissolute persons who go about begging, common gamblers, persons who use juggling or unlawful games or plays, common drunkards, common night walkers, thieves, pilferers or pickpockets, traders in stolen property, lewd, wanton and lascivious persons, keepers of gambling places, common railers and brawlers, persons wandering or strolling around from place to place without any lawful purpose or object, habitual loafers, disorderly persons, persons neglecting all lawful business and habitually spending their time by frequenting houses of ill fame, gaming houses, or places where alcoholic beverages are sold or served, persons able to work but habitually living upon the earnings of their wives or minor children shall be deemed vagrants and, upon conviction in the Municipal Court shall be punished as provided for Class D offenses.
   92 S.Ct. at 840, 31 L.Ed.2d at 112.

vague, no part of the ordinance can stand.[27] The defective prefatory language is "with purpose and intent to cause public *inconvenience, annoyance* or *alarm* or recklessly create a risk thereof." (emphasis added). Coates v. Cincinnati, *supra,* specifically declared the word "annoying" to be unconstitutionally vague and the words "inconvenience" and "alarm" are no less so. The rest of the ordinance is also peppered with indefinite words—"threatening" "tumultuous behavior", "unreasonable noise", "offensively coarse", and "abusive language".[28] The phrase "tumultuous behavior", for example, might encompass conduct ranging from actual violence to speaking in a loud and excited manner; depending on the arresting officer's temperament, everything from the most provocative insult to the mildest obscenity might be termed "abusive language".[29]

In sum, not only does the ordinance fail to give adequate notice of what conduct is prohibited, but it is particularly subject to the abuse of uneven enforcement. As Justice Douglas points out in *Papachristou:*

> Those generally implicated by the imprecise terms of the ordinance—poor people, nonconformists, dissenters, idlers —may be required to comport themselves according to the life-style deemed appropriate by the . . . police and the courts. Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law. It furnishes a convenient tool for 'harsh and discriminatory enforcement by prosecuting offi-

cials, against particular groups deemed to merit their displeasure.'

405 U.S. 156, 92 S.Ct. 839, 847, 31 L.Ed.2d 110, 120. We therefore hold that Anchorage Code of Ordinances § 15–1(mm), in its entirety, is void for vagueness and remand to the superior court with instructions to enter judgment in favor of appellants declaring the ordinance as drafted unconstitutional.

BOOCHEVER, J., not participating.

## OPINION
## ON PETITION FOR REHEARING

Although the City of Anchorage did not file a responsive brief or otherwise participate in the appeal of this case, we have granted the City permission to file a petition for rehearing pursuant to Supreme Court Rule 35. In its petition the City argues that the recent United States Supreme Court opinion in Colten v. Kentucky, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), demonstrates that we were mistaken in our conclusion that the entire Anchorage "disorderly conduct" ordinance was overbroad and vague. We disagree.

Colten had been convicted of violating a Kentucky disorderly conduct statute which provided in relevant part:

> (1) A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
> . . . . . .
>
> (f) Congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse . . . .

---

27. Subsection (3) of the ordinance, which prohibits lodging in various privately-owned properties without the owner's consent, is otherwise valid. Its provisions are not by themselves vague, and since the prohibited conduct is not entitled to constitutional protection no overbreadth problem is presented.

28. Regarding the last phrase specifically, see Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 at 415 (1972).

29. Similarly, it is unclear whether the word "threatening" is limited to threats of immediate physical violence, whether "offensively coarse utterances" encompass more than the Supreme Court's definition of obscenity, and just what an "unreasonable noise" might be.

The prefatory language of the Kentucky statute is quite similar to that of the Anchorage ordinance.[1] *Colten* can only be distinguishable from *Marks* by noting that the latter case is an action for declaratory judgment in which no limiting construction of the ordinance was requested or considered. However, *Colten* is a perplexing opinion, out of the mainstream of United States Supreme Court precedents, most of which were not cited by the Court, and its effects on the vagueness and overbreadth doctrines must be considered extremely uncertain.

In support of its conclusion that the Kentucky statute, *as applied*, was not unconstitutionally vague, the court relied entirely on the lack-of-notice rationale, noting simply that the "root of the vagueness doctrine is a rough idea of fairness", and that Colten should have understood that he could be convicted under the statute after he disobeyed a police order to move on.[2] 92 S.Ct. 1953. The Court made no mention of the possibility of uneven enforcement which, just four months earlier in Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110, 115 (1972), had been explicity recognized by the Court, in a unanimous opinion, as the alternate rationale for the vagueness doctrine. The failure to mention the arbitrary enforcement rationale is particularly strik-

ing in light of Colten's allegation that he was arrested under the statute because of his long hair and beard and because he had just participated in a demonstration. Colten v. Commonwealth, 467 S.W.2d at 379. Surely a statute which makes it a criminal act to gather in a public place and refuse to obey a police order to move on, raises at least the *possibility* of arbitrary and discriminatory enforcement.[3]

The Court did not refer to its year-old holding in Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), where a Cincinnati, Ohio, ordinance which made it a crime for "three or more persons to assemble . . . on any of the sidewalks . . . and there conduct themselves in a manner *annoying* to persons passing by . . . ." (emphasis added) was declared invalid on its face for vagueness and overbreadth. The Court stated:

In our opinion this ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, . . . .

Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, "men of common intelli-

---

1. *See* Colten v. Commonwealth, 467 S.W. 2d 374 (Ky.1971).

2. Colten was driving in a procession of automobiles that had formed after a demonstration at the Lexington Airport. The lead vehicle was stopped by the police and the driver issued a citation because the automobile had expired plates. Colten attempted to converse with the officers about his friend's citation and was arrested after he allegedly refused to obey a police request to leave. 92 S.Ct. 1953.

3. Nor did the court mention Shuttlesworth v. Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965), where the Court reversed a conviction under a Birmingham, Alabama ordinance which provided that it was unlawful "for any person to stand or loiter upon any street or sidewalk of the city after having been

requested by any police officer to move on." Because the Birmingham ordinance and the Kentucky statute are similar in effect, the *Shuttlesworth* holding seems inconsistent with the Court's opinion in *Colten*. In *Shuttlesworth*, the Court stated:

Literally read, therefore, the second part of this ordinance says that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer of that city. The constitutional vice of so broad a provision needs no demonstration. It "does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat." (citation omitted)

*Id.* at 90, 86 S.Ct. at 213, 15 L.Ed.2d at 179.

gence must necessarily guess at its meaning." (citation omitted).

*Id.* at 614, 91 S.Ct. at 1688, 29 L.Ed.2d at 217. Both the Kentucky statute considered in *Colten* and the Cincinnati ordinance stuck in *Coates* purported to restrict public assembly. If Cincinnati cannot constitutionally restrict assembly that is *"annoying"* to passers-by, how can Kentucky be allowed to outlaw assembly that causes "public *annoyance"*?

Considered against the backdrop of previous Supreme Court precedents, the Court's treatment of the overbreadth issues in *Colten* is vague. The Court held that the Kentucky statute, limited as follows by the Kentucky Court of Appeals, was not overbroad:

> As reasonably construed, the statute does not prohibit the lawful exercise of any constitutional right. We think that the plain meaning of the statute, in requiring that the proscribed conduct be done "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," is that the specified intent must be the *predominant* intent. Predominance can be determined either (1) from the fact that no bona fide intent to exercise a constitutional right appears to have existed or (2) from the fact that the interest to be advanced by the particular exercise of a constitutional right is insignificant in comparison with the inconvenience, annoyance or alarm caused by the exercise.

467 S.W.2d at 377. The only overbreadth case mentioned by the Court is Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). It is questionable, however, whether the latter part of the Kentucky court's construction can be squared with the following language from

Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131, 1134 (1949), repeated by the Court in Edwards v. South Carolina, 372 U.S. 229, 237, 83 S.Ct. 680, 684, 9 L.Ed.2d 697, 703 (1963):

> [F]reedom of speech [though not absolute] . . . is [nevertheless] protected against censorship or punishment, unless shown likely to produce a clear and present danger of a *serious substantive evil that rises far above public inconvenience, annoyance, or unrest.* . . . (emphasis added).

Although *Terminiello* and *Edwards* signify that mere public inconvenience or annoyance are insufficient evils to justify limiting first amendment freedoms, *Colten* does not distinguish either.[4] The Court did not refer to the following highly relevant language from *Coates*:

> Our decisions establish that mere public intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms. [citations omitted] The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be "annoying" to some people. . . . And such a prohibition, in addition, contains an obvious invitation to discriminatory enforcement against those whose association together is "annoying" because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens. (footnotes omitted)

The reference to the opinion of the Kentucky Court of Appeals provides little additional aid in interpreting the Supreme Court opinion. That opinion contains a number of statements which require ex-

---

4. The Kentucky court, after quoting from *Edwards*, did make an effort to deal with the inconsistent language:

   [W]e do not believe that the evil must be one that rises far above inconvenience, annoyance or alarm where the particular exercise of the right of speech falls far below the level of minimum social value. We think it is a matter of balancing of interests and that where the interest which the individual seeks to advance through exercise of freedom of speech is minuscule in comparison with the public's interest in being protected from the consequences of that exercise, the public's interest should prevail even though the harm the public might be exposed to is no more than inconvenience or annoyance.
   467 S.W.2d at 377.

planation. For example, citing an obscenity case, the court argued:

> If the lack of redeeming social value is a basis upon which the right of freedom of speech may be required to yield to the protection of contemporary standards of morality . . . it would seem that the public's interest in being protected from inconvenience, annoyance or alarm should prevail over any claimed right to utter speech that has no social value.

467 S.W.2d at 377. This is an obvious non sequitur. For while the court has declared that obscene speech is not protected, no decision has held that non-obscene speech without social value is not entitled to constitutional protection. The reason, presumably, is that government officials cannot make principled distinctions as to what speech lacks "social value" any more than they can decide what speech is "offensive."[5] The Kentucky court's treatment of the vagueness issue is also noteworthy:

> It is true that the statute does not attain idealistic perfection in preciseness, but it is fully as precise as some of the language of the Bill of Rights. We do conceive that the defining of prohibited conduct must be more precise than the defining of a right of conduct. To illustrate: If "peaceably" is a sufficiently precise word in the First Amendment's guarantee of the right of assembly, should "nonpeaceably" be considered too vague in a statute describing the kind of assemble [sic] that is prohibited?

467 S.W.2d at 378. The answer to the court's rhetorical question must be "yes" if the word fails to give citizens notice of what is prohibited or licenses arbitrary enforcement; clearly zones of prohibited conduct must be defined with greater clarity than are constitutional rights.

In sum, *Colten* seems difficult to reconcile in letter and spirit with a long line of Supreme Court cases, which were not referred to by the Court in the opinion.[6] As noted above, however, the Court emphasized that it was reviewing the Kentucky statute as construed by the state court and as applied to the specific facts of Colten's case.[7] Notwithstanding any discomfiture we may have about the Supreme Court's opinion, *Marks*, a declaratory judgment action, is clearly distinguishable. For example, regarding the alleged vagueness of the Kentucky statute, the Court stated:

> Any person who stands in a group of persons along a highway where the po-

---

5. *See* Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 25, 29 L.Ed.2d 284, 294 (1971).

6. Among the more conspicuous omissions were five decisions handed down in the last two years: Papachristou v. Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed. 2d 110 (1972); Gooding v. Wilson, 1405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686 29 L.Ed.2d 214 (1971); Palmer v. Euclid, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971); Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

7. This factor does not, by itself, adequately distinguish *Colten* from prior Supreme Court precedents. As the court noted succinctly in Coates v. Cincinnati:
   The ordinance before us makes a crime out of what under the Constitution cannot be a crime. It is aimed directly at activity protected by the Constitution. We need not lament that we do not have before us the details of the conduct found to be annoying. It is the ordinance on its face that sets the standard of conduct and warns against transgression. *The details of the offense could no more serve to validate this ordinance than could the details of an offense charged under an ordinance suspending unconditionally the right of assembly and free speech.* (emphasis added).
   402 U.S. 611, 616, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214, 218–219 (1971). In other words, to protect first amendment freedoms, the Court has allowed "vicarious" assaults on invalid statutes; a defendant need not show that his conduct was itself entitled to protection as a prerequisite to successfully attack an overbroad or vague statute. *See generally* Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970).

lice are investigating a traffic violation and seeks to engage the attention of an officer issuing a summons should understand that he would be convicted under subdivision (f) of Kentucky's statute if he fails to obey an order to move on.

92 S.Ct. at 1957. In *Marks*, on the other hand, the Anchorage ordinance was attacked on its face and the question was whether, under a fair reading of the ordinance, it was susceptible to unconstitutional applications, not whether a particular application was infirm. Regarding the overbreadth issue, *Colten* was appealed after the Kentucky Court of Appeals had placed a judicial gloss on the statute which the Court asserted prevented any overbroad unconstitutional application:

> As the Kentucky statute was construed by the state court, however, a crime is committed only where there is no bona fide intention to exercise a constitutional right—in which event, by definition, the statute infringes no protected speech or conduct—or where the interest so clearly outweighs the collective interest sought to be asserted that the latter must be deemed insubstantial.

92 S.Ct. at 1957. In *Marks*, since the City made no appearance, no such limiting construction of the Anchorage ordinance was requested or considered.

■ This leads to a final consideration: Since the City offered this court no assistance either in the form of legal authority or in a suggested judicial gloss that would have enabled this court to interpret the ordinance in such a way that constitutional pitfalls would be avoided, the City is in a particularly weak position to urge rehearing. That position is further undermined by the fact that the authority now cited by the City is distinguishable.

The petition for rehearing is therefore denied.

BONEY, C. J., and BOOCHEVER, J., did not participate in decision on rehearing.