One William Blanton, a witness for the State, testified that in July last he met with the prisoner on the road and went with him to a grocery kept by one Morrison, a woman, about three miles east of Shelby, on the public road. At the grocery they found Calvin Rippy, the deceased, who was "tight." The deceased invited the prisoner to drink, and he refused to do so, saying that "when he drank he wanted a half pint." The deceased was dancing around the house, and Mrs. Morrison ordered him out. The deceased was a very deaf man, and witness thinks did not hear the order. Mrs. Morrison tried to put him out, and called on the prisoner to assist her, and the two together got him out. The prisoner and the deceased then commenced quarrelling, each swearing that he was the "best man." They went off a short distance to a stable and continued quarrelling, witness could not remember what about. Witness was out at the stable, too, and at last heard the deceased say to the prisoner, "Don't you follow me," and deceased started down the road. The prisoner replied, "D___n you, I will follow you." He then picked up a seasoned oak stick, struck it against the corner of the stable, and started in *Page 151 
the direction of the deceased, who was retreating. Witness did not look any farther, but in a very short time he heard a blow, and looking in the direction of the sound, he saw the deceased staggering backwards. A fence rail was leaning one end on the breast of deceased and the other end on the ground, and the rail fell across his breast as he fell on his back. The prisoner struck the deceased again as he fell, with the stick, (which was produced) and deceased died in a few minutes. The stick was about two and a half feet long and two and a half inches in diameter, of seasoned oak, and rough. It was admitted to be a deadly weapon.
Witness further testified that the deceased had gone twenty-five or thirty yards from where he started. He fell two or three yards from the fence, on the side of the road. The fence was a rail fence. Both licks were on the right side of the head. The deceased did not have his hand on the rail when witness looked and saw them. Witness thinks the prisoner took up the first stick he came to. He heard no conversation before the blow. Witness was "tight," but thinks he remembers all he saw. After the deceased fell, the prisoner walked back instantly to where witness was sitting, a distance of about twenty-five or thirty yards, and they had no conversation.
Prisoner's counsel then proposed to prove the declarations of the prisoner to the witness, when he came back. The counsel for the State objected, and the Court sustained the objection. To this ruling of his Honor, the prisoner excepted.
Isabella Morris testified that she kept a grocery. The deceased was there when the prisoner and Blanton came. About two hours before the homicide occurred, she heard the prisoner say "that the deceased had gone to his mother's house and acted the dog, and he intended to give him "the best he had in his shop." The prisoner also said that deceased had cursed his mother when no one was there but his mother and sister.
On cross-examination she stated that the deceased was "tolerable drunk," and was dancing around in the house, and said *Page 152 
"he was fifty-five years old, but was a longways the best man in the house." Witness and the prisoner put him out. The stable was about ten steps from the grocery. She did not think deceased heard the prisoner use the threats or speak of his going to the house of the prisoner's mother, as he was very deaf.
Sometime after the homicide she went out and saw the deceased. She saw blood in the middle of the road. She saw where the body had been dragged aside. The rail was then lying in the middle of the road, about four or five yards from the blood. She thought the rail was taken from the fence behind the stable, as one was missing there. That the rail was nearer her house than when it was on the fence. The rail was four or five steps nearer the stable, where deceased started from, than where the rail was missing from the fence. No rail was missing from the fence in the morning. All three of the men were drunk. The prisoner and Blanton bought a quart and drank freely of it. She thinks Blanton was drunkest of the three, and the deceased drunker than the prisoner. She saw the prisoner take up the stick, but he passed out of her sight as he went off with it down the road.
Dr. Andrews, a witness for the State testified that the wounds on the deceased consisted of several severe blows on the right side of the head and neck. There were three or four blows. The prisoner had lost his right arm, and was twenty-two or twenty-three years old. He is slender but stout. The deceased is about fifty-five or fifty-six years old, deaf. He was quarrelsome when drunk.
The prisoner's counsel then proposed to prove that the prisoner's mother's family only consisted of herself and daughter.
The counsel for the State objected and the Court sustained the objection. To this ruling of his Honor the prisoner excepted.
In the argument, the counsel for the prisoner admitted the killing by the prisoner and that a deadly weapon was used and that the case was one of manslaughter. *Page 153 
The Court charged the jury:
"That as the killing with a deadly weapon was admitted by the prisoner it was his duty to prove to the satisfaction of the jury the facts on which he relied to mitigate the offence to manslaughter, or they must arise out of the State's testimony."
In response to instructions prayed by the counsel for the State, his Honor farther charged the jury:
"That if the prisoner pursued the deceased with a present purpose or design to kill or do him great bodily harm, and did kill him in pursuance of this design, it was murder, and it was immaterial in that view whether the prisoner was assaulted by the deceased or not.
That if the prisoner pursued the deceased with a deadly weapon, and the deceased had reasonable ground to believe that the prisoner was about to kill him or do him great bodily harm, the deceased had the right to defend himself with the rail, and this would not mitigate the case to manslaughter, if the prisoner killed the deceased in pursuance of the original purpose or design to kill the deceased or do him great bodily harm."
In response to the position taken by the counsel for the prisoner, in his argument, the Court charged the jury:
"That if the prisoner did not follow the deceased with the purpose or design to kill him and the deceased assaulted the prisoner with a rail, it was manslaughter, and that if both were willing to fight and they entered into a mutual combat, on a sudden quarrel, it would be manslaughter."
The Court then rehearsed the argument of the State's Attorney, who contended that the deceased was standing by the fence when the prisoner struck him and that he pulled the rail on himself as he fell. The theory of the defendant was that the deceased had taken the rail and advanced on the prisoner; and instructed the jury that these were questions for them to solve, — that the facts were for them, and they took the law from the Court. *Page 154 
After his Honor concluded his charge the counsel for the defence asked the following instructions in writing:
1. If the prisoner bore malice against the deceased, and they met by accident and a quarrel ensued, and a fight, whereupon the defendant killed the deceased with a deadly weapon, the rule referring the homicide to the previous malice did not apply.
The Court gave the charge, but told the jury they must be satisfied that there was a fight.
2. That if deceased struck or attempted to strike the prisoner, and the prisoner killed him as detailed, it was manslaughter. The Court declined the instruction, and told the jury that there was no evidence that the deceased struck or attempted to strike, the prisoner.
3. If the quarrel was sudden, and the defendant killed the deceased while the latter held in his hand a deadly weapon, it was but manslaughter, if done in the heat of passion.
The Court declined to charge as requested.
4. If the defendant and the deceased engaged in a fight mutually, and defendant killed the deceased with a deadly weapon it is but manslaughter, and that it does not matter which struck the first blow."
The Court stated that this charge had already been substantially given.
The jury returned a verdict of "guilty" in the manner and form as charged in the bill of indictment.
Counsel for the prisoner then moved for a new trial. The motion was overruled by the Court, and the prisoner then moved in arrest of judgment, because the indictment did not charge that the stick was a deadly weapon. Motion overruled by the Court, and sentence pronounced, whereupon the prisoner appealed.
We do not concur in the view of this case taken by his Honor. We will not advert to his opinion as to the presumption of malice, from the use of a weapon likely to kill, or lay any stress upon the distinction that might be taken between the use of a gun or pistol, and the use of stick or a stone. The one, generally used as a means of offence without any positivedeadly purpose. The other, always used with an intent to kill.
We might put our opinion on this ground: According to the view his Honor takes of it, "there is no evidence of a fight." This depends upon what is meant by "a fight." Is it necessary that both parties should give and take blows, or is it sufficient that both parties should voluntarily put their bodies in a position to give and take blows, and with that intent? To illustrate: Suppose Rippy had not been killed. Upon an indictment for an affray, would he not have been convicted? Two men go out to fight. One is knocked down on the "first pass," and that is the end of it. Are they notboth guilty of an affray? That is, "a fight by mutual consent."
But passing all this by, we put our opinion on the ground, that his Honor told the jury, "there was no evidence that the deceased struck, orattempted to strike, the prisoner." Upon a consideration of the case, our conclusion is, that there was evidence tending to show, that Rippyattempted to strike the prisoner, and had committed an assault, which is defined in the books to mean "an offer or attempt to strike another." We have this case: The parties are "tight" — talk about manhood — get into a quarrel, and Rippy starts off saying, "Don't follow me." What he meant by these words, was a question for the jury. Was he begging off, or backing out from a fight? Or did he mean, "if you follow me there will be a fight"? This was a question for the jury. The position of the body, the rail, and the blows being on the right side of the head, the prisoner having lost his right arm, was evidence tending to show that Rippy, as soon as he saw that the prisoner was following him, jerked a rail off of the fence, and advanced to *Page 156 
meet him in combat. So then there was a sudden quarrel, a fighting by consent — no evidence of an unfair advantage — the parties take up such weapons as, in their haste, they are able to lay their hands on, and death ensues. Such, as it seems to us, was a view that the prisoner had a right to have presented to the jury. His Honor, after putting the case to the jury, as one where the prisoner pursued the deceased with a present purpose to kill him, and the deceased had a right to defend himself, ought to have presented the other view for their consideration, and instructed them, that if the killing was the result of a sudden quarrel and an affray growing out of it, and the challenge of the deceased, as understood by the prisoner, the law, out of indulgence to the passions of men, does not look upon it as a case of cold, deliberate murder, as when one lies in wait and kills of malice, but ascribes it to the furor brevis, sudden passion, excited by the quarrel, and the menace, "don't you follow me." He ought to have added, although mere words do not amount to legal provocation, yet words, followed up by the hostile announcement of a willingness to fight, and an affray instantly resulting therefrom without "cooling time" — no unfair advantage being taken — no blow from behind — but the parties facing each other and rushing to the conflict in deadly strife, relieved the case from the charge of deliberate murder, and put it under the mitigated offence of manslaughter, i. e. when one kills another in the heat of passion excited by legal provocation.
There is error.
PER CURIAM. Venire de novo. *Page 157