## NEWPORT.

### STATE vs. ISAAC WHITE and EMERSON ASH.

A private person may, of his own motion, abate a public nuisance where its existence is a source of special injury to him, only when he can do so without committing a breach of the peace.

What constitutes a breach of the peace discussed

A. obstructed a public highway which led to a beach by maintaining a gate across it. B., who had a sea-weed privilege on the beach, and his hired man, C., in attempting to go through the gate to the beach with an ox-team for sea-weed belonging to B., were forcibly resisted by A. and another who were armed with sticks. B. and C., having anticipated such resistance, had come prepared to overcome it with the necessary force. After using some violent, profane and threatening language towards A., they broke down the gate by backing their ox-team against it, and forced their way through, using a pistol, a pitchfork and a hoe in the fight which occurred and in which A. was injured. B. and C. were indicted for an assault upon A. with intent to kill.

---

[1] Printed in 14 R. I. p. 615.

*Held,* that B. and C. committed a breach of the peace in removing the obstruc-
tion, and were the aggressors in the fight.

*Held,* further, that it was immaterial who actually struck the first blow.    *State* v.
*Sherman,* 16 R. I. 631, distinguished.

DEFENDANTS' petition for a new trial.

*Providence, February* 17, 1894.    TILLINGHAST, J.    This
is an indictment against the defendants, charging an assault
on one Samuel E. Almy with intent to kill and murder.

At the trial of the case in the Court of Common Pleas the
defendants were found guilty of an assault with a dangerous
weapon, and they now petition for a new trial on the ground
that the verdict is against the evidence, and that the presid-
ing justice erred in his rulings of law and in his instructions
to the jury.

The facts in the case, as shown by the stenographer's re-
port thereof, are substantially these :    The defendant Isaac
White had a sea-weed privilege on Fogland Beach in the
town of Tiverton, which he had habitually exercised and
which was known to said Almy.    On the day of the happen-
ing of the alleged assault, White sent his hired man Ash,
one of the defendants, together with a boy named Sweet,
with a team to get sea-weed from said beach.    There was,
and for upwards of a century had been, a public highway
leading to the beach, as was subsequently decided by this
court in *Almy* v. *Church,* ante, p. 182, but at the point
where the affray occurred it was, and from time immemo-
rial had been, obstructed by a gate wrongfully maintained
by said Almy and his predecessors in title to the farm then
owned by him, and the case referred to was then pending in
this court to determine as to the right of the town council of
Tiverton to open and define said highway from the gate west-
ward to the beach.

On the arrival of said Ash and Sweet at the gate on their
way to the beach, the complainant who, having seen them
approaching, had left his work in the field and gone to said
gate for the purpose of preventing them from going through
the same, forbade them from opening the gate ; telling Ash
that if he went through the gate he, Almy would go through

his blood; Almy at the same time stepping back and procuring two sticks from the corner of the wall, and giving one of them to Hussey, his hired man, and telling him to use it if necessary. After some talk between Ash and Almy as to the right of the former to go through said gate, and after being forbidden as aforesaid, Ash said to the boy Sweet : "We can't get anything here now, we might as well go and tell the old man," as he called him (referring to White), "and if he wants to go through to come down." Whereupon the young man started on his errand, and Ash turned his team around and drove away to a neighbor's house near by.

After an hour or so had elapsed, Ash, who in the meantime had armed himself with a pistol, returned to the gate with his team, White then being with him ; whereupon Ash said, "Will you open that gate now?" and Almy replied, "No, I will prevent your entering for any purpose whatever." Ash said, "We have got the tools to do it with, and we are going through." Whereupon the defendants, after some delay and parleying, during which violent, profane and threatening language was used by the defendants towards Almy, and after a request by White to Almy to open the gate, which was again refused, Almy saying to White that if he did open it he would have to go over his (Almy's) dead body, Almy and Hussey having the sticks in their hands, the defendants turned their ox-team around and backed it violently against the gate several times for the purpose of breaking it down, and thereby obtaining access to the beach. While the defendants were thus engaged, Almy, together with said Hussey, persistently and violently strove to prevent the team from going through, by holding the gate, by punching and belaboring the oxen with the stick, and also by inserting the stick in the wheels of the cart. The defendants, however, finally succeeded in breaking through the gate. Whether or not any direct personal violence was used by either party before the gate was actually forced open, is not entirely clear from the evidence, but either during the breaking thereof, or immediately afterwards, there was a violent

personal encounter between Almy and the defendants growing out of the transaction, during which the defendants used a hoe, pitchfork and pistol, breaking the arm of Almy and otherwise injuring him to the extent of disabling him from offering further resistance to their attempts to go through the gate with their team; whereupon they proceeded to the beach for the purpose aforesaid. The defendants testify that White was knocked down and rendered insensible by Almy during the affray, and also that Ash was beaten by him with a stick or club.

Briefly summarized, then, the evidence submitted shows that the defendants were lawfully on a public highway going to the beach to collect White's property, the sea-weed which was there; that said Almy had illegally obstructed the highway by maintaining the gate across the same, which was a public nuisance and which specially damnified the defendant White; that Almy refused to allow the gate to be opened and aggressively defended the same by holding it to prevent it from being opened, and attacking the vehicle and the oxen of the defendants, while the latter were striving to force their way through, and that during or immediately after the removal of said obstruction in the manner aforesaid, a personal encounter ensued between the defendants and Almy, in which the latter received the injuries complained of, and also in which, according to defendants' testimony, White was knocked down and rendered insensible by Almy, and Ash was also beaten by him with a stick.

The first question which arises in view of this state of facts is, whether the presiding justice erred in his refusal to in-struct the jury as requested by the defendants' counsel: 1, "That if the jury finds that the defendants and their cart were on this highway intending to take the most direct track to the beach and salt water for their sea-weed, and that Almy interrupted them, Almy, and not they, was the ag-gressor;" 2, "That if the jury find that these parties were attacked while upon a public highway of the state, Almy, and not they, was the aggressor."

The answer to this question depends upon the correctness

of the defendants' contention as to their legal right to remove said obstruction by force, while the complainant was present and actively defending the same. If they had this right, then Almy, and not they, was the aggressor, and said request to charge should have been granted—otherwise not.

We think it is well settled, notwithstanding some decisions and *dicta* to the contrary, that a private person may not of his own motion abate a strictly public nuisance. *Dimes* v. *Petley*, 15 Q. B. 276; *Brown* v. *Perkins*, 12 Gray, 89; *Griffith* v. *McCullum*, 46 Barb. 561; Wood on Nuisances, §§ 729–737, and cases cited; *Bowden* v. *Lewis*, 13 R. I. 189. It is also equally well settled that a private person may, of his own motion, abate a public nuisance where the existence thereof is a source of special injury to him, provided he can do so without a breach of the peace. 3 Bl. Com. 5; 16 Amer. & Eng. Encyc. Law, 990–4, and cases cited; *State* v. *Keeran*, 5 R. I. 497, 510; *Clark* v. *Ice Co.*, 24 Mich. 508; *Mayor of Colchester* v. *Brooke*, 7 Q. B. 339; *Rung* v. *Shoneberger*, 2 Watts, 23; 26 Amer. Dec. 95, 100; 4 Wait's Actions and Defenses, 778, and cases cited; *Day* v. *Day*, 4 Md. 262, 270; *State* v. *Flannagan*, 67 Ind. 140. In Cooley on Torts, 2d ed. 48–9, the law is well stated as follows:

"The question who may abate a nuisance may depend upon whether the nuisance is public or private. If it is a private nuisance, he only can abate it who is injured by its continuance; if it is a public nuisance, he only may abate it who suffers a special grievance not felt by the public in general. Therefore, if one places an obstruction in a public street, an individual who is incommoded by it may remove it; but unless he has occasion to make use of the highway he must leave the public injury to be redressed by the public authorities. It is the existence of an emergency which justifies the interference of the individual.

"In permitting this redress, certain restrictions are imposed to prevent abuse or unnecessary injury. One of these is, that the right must not be exercised to the prejudice of the public peace; therefore, if the abatement is resisted, it becomes necessary to seek in the courts the ordinary legal

remedies." This being the law, the question which naturally arises is, did the defendants commit a breach of the peace in the abatement of the nuisance in question? We think they did. Any violation of the public order or decorum is a breach of the peace. *Galvin* v. *The State*, 6 Cold. 283. The term is generic and includes unlawful assemblies, riots, affrays, provoking a fight, and other acts of a similar character. The use of grossly indecent, profane and abusive language towards another person upon the public street or highway in the presence of others is a breach of the peace.

In *Davis* v. *Burgess*, 54 Mich. 514, the court said : "Now, what is understood by a 'breach of the peace?' By 'peace,' as used in the law in this connection, is meant the tranquillity enjoyed by the citizens of a municipality or community where good order reigns among its members. It is the natural right of all persons in political society, and any intentional violation of that right is 'a breach of the peace.' It is the offence of disturbing the public peace, or a violation of public order or public decorum. Actual personal violence is not an essential element in the offence. If it were, communities might be kept in a constant state of turmoil, fear and anticipated danger from the wicked language and conduct of a guilty party, not only destructive of the peace of the citizens, but of public morals, without the commission of the offence. The good sense and morality of the law forbid such a construction."

"Besides actual breaches of the peace," says Blackstone, (4 Bl. Com. 150) "anything that tends to provoke or excite others to break it is an offence of the same denomination."

It has been held that driving a carriage through a crowded or populous street at such a rate or in such a manner as to endanger the safety of the inhabitants, is an indictable offence at common law, and amounts to a breach of the peace. *United States* v. *Hart*, 3 Wheeler's Cr. C. 304. See also *Commonwealth* v. *Foley*, 99 Mass. 497 ; 1 Bishop on Criminal Law, 2d ed. § 400, and cases cited ; *Crosland* v. *Shaw*, 12 Atlantic Rep. 849 ; *Taaffe* v. *Kyne*, 9 Mo. App. 15.

These authorities are sufficient to define and illustrate what constitutes a breach of the peace, and to show that the defendants were clearly guilty of the commission thereof in attempting to abate the nuisance in the manner aforesaid. They went with the evident intention of breaking open the gate by overcoming whatever force Almy might oppose to them; they were armed with a pitchfork, a hoe and a pistol; they used violent and profane language in a public highway in the presence of at least six persons; they backed their team against the gate while Almy and Hussey were on the opposite side thereof, the latter holding the gate and the former striving to prevent the cart from going through; they provoked a quarrel and brought on a personal encounter. In short, they went to the place in question prepared for and evidently expecting a fight in connection with the abatement of the nuisance, and they were not disappointed. They took the law into their own hands, and in doing so they acted at their peril. That Almy was in the wrong, and liable to indictment for maintaining the nuisance as well as for the use of violence against the defendants, may be assumed. But this fact did not justify the defendants in committing a breach of the peace in abating it, the public peace being of more importance than the assertion of the defendants' right to use said highway. We are therefore of the opinion that the defendants and not Almy were the aggressors in the affray referred to, and hence that the presiding justice properly refused to charge as requested. If the defendants' counsel in making said requests to charge intended to claim that in case the jury should find that Almy and not the defendants committed the first act of personal violence then they were entitled to an acquittal, it is enough to reply that as the defendants were the aggressors in the affray by wrongfully bringing on the fight as aforesaid, it was wholly immaterial who actually struck the first blow, and hence that said requests were properly refused.

But the defendants' counsel contends that the case at bar is quite similar to *State* v. *Sherman*, 16 R. I. 631, and hence

that the defendants are entitled to be exonerated, as the defendant was in that case.

*State v. Sherman* was a very different case from this. There, the defendant while peaceably engaged in removing a causeway of dirt and stones wrongfully placed by the complainant across the mouth of the cove, through which the defendant had the right of ingress and egress to and from his land by boat, was attacked by complainant, whereupon defendant, as he testified, pushed him away using no more force than was necessary in so doing.

At the trial of said case in the Court of Common Pleas the defendant asked the court to instruct the jury, "That a man in a public place, if attacked, may resist with his natural weapons, using no more force than is necessary, without retreating." This request was refused, and this court held it was error; that one wrongfully assailed in a public place is not obliged to retreat from his assailant in order to avoid a conflict, but may defend himself, meeting force with such force as is needful for his protection, unless such defence involves a homicide, when a different rule may prevail. In the case at bar no question of self-defence arises. The defendants were not engaged in the peaceable removal of the obstruction in question when attacked by Almy, but were proceeding in a hostile manner in violation of the peace to effect its removal. The personal conflict which resulted was brought on by the defendants themselves and hence they cannot be permitted to urge that they acted in self-defence. In *State v. Sherman*, the exact reverse of this was true, and the defendant was properly permitted to rely on his right of self-defence.

The second ground for a new trial is that the verdict was against the evidence. Upon a careful examination of the evidence we are not convinced that it is insufficient to sustain the verdict.

*Petition for a new trial denied and dismissed.*

*Willard B. Tanner*, Assistant Attorney General, for the State.

*Arnold Green*, for defendants.