Ginnie DAWSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10137.

Court of Appeals of Alaska.

Oct. 21, 2011.

Tracey Wollenberg, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Ann B. Black, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

This case requires us to construe one clause of our disorderly conduct statute, AS 11.61.110—specifically, subsection (a)(5) of the statute, which declares that a person commits disorderly conduct if the person "engages in fighting other than in self-defense".

The precise issue is whether the phrase "engages in fighting" encompasses all instances where one person strikes another—or whether, instead, this phrase is limited to situations where two or more people share a mutual intent to trade blows (or at least attempt to trade blows).

For the reasons explained in this opinion, we conclude that, for purposes of this subsection of the disorderly conduct statute, "fighting" requires a mutuality of intention, and therefore this subsection of the statute does not cover all situations where one person strikes another.

### Underlying facts

The Appellant in this case, Ginnie Dawson, was charged with fourth-degree assault under AS 11.41.220(a)(1) for hitting her domestic partner, Patrick Meyer, with her fists and throwing a baking pan at him. To prove this assault charge, the State had to establish that Dawson "recklessly cause[d] physical injury to [Meyer]".

As used in our criminal code, the term "physical injury" means "physical pain or an impairment of physical condition".[1] The State alleged that Dawson's acts of striking Meyer with her fists and with the baking pan constituted fourth-degree assault because this conduct caused Meyer to suffer physical pain.

At trial, Dawson conceded that she struck Meyer, but she contended that she had not caused him physical pain. Meyer took the stand and agreed that he had not suffered pain (other than emotional pain) during the attack.

Based on this testimony, Dawson's attorney asked the trial judge to instruct the jury on the lesser offense of disorderly conduct as defined in AS 11.61.110(a)(5)—"engag[ing] in fighting other than in self-defense". The defense attorney argued that if the jury believed Meyer's testimony that he had not suffered pain, then the State would have proved only that Dawson fought with Meyer—and, thus, disorderly conduct under subsection (a)(5) would be the proper verdict.

The trial judge refused to instruct the jury on disorderly conduct because (1) the judge concluded that "fighting" meant a mutual physical struggle between two or more people, and (2) there was no evidence that Meyer and Dawson engaged in mutual struggle— i.e., no evidence that Meyer intended to fight Dawson, or that he responded with physical force to Dawson's blows.

The jury convicted Dawson of fourth-degree assault, and Dawson now claims that the trial judge committed error by refusing to instruct the jury on disorderly conduct as a potential lesser included offense.

### This Court's decision in Hedgers v. State

As we have just explained, the primary issue raised in this appeal is whether the phrase "engages in fighting" (as used in subsection (a)(5) of the disorderly conduct statute) includes all situations where one person strikes another, even though there is no mutual combat—i.e., even though the second person does not wish to engage in a physical struggle, and does not respond with force. This Court has already directly addressed and answered this question in an unpublished opinion: Hedgers v. State, Alaska App. Memorandum Opinion No. 4056 (June 2, 1999), 1999 WL 349062.

The defendant in Hedgers was convicted of disorderly conduct under subsection (a)(5) of AS 11.61.110—i.e., for engaging in fighting other than in self-defense—based on evidence that, during a verbal dispute with another woman, she used her knee to kick this other woman in the leg. Hedgers, slip opinion at 1–2, 1999 WL 349062 at *1.

On appeal, Hedgers argued that she was wrongly convicted because "fighting" required mutual combat. This Court rejected Hedgers's argument. We held that the term "fighting" encompassed any "physical struggle"—more specifically, that it included "those fights that are one-sided due to choice, surprise by the aggressor, or simply the superior ability of a participant." Hedgers, slip opinion at 2–3, 1999 WL 349062 at *2.

---

1. AS 11.81.900(b)(46).

Thus, in *Hedgers*, this Court rejected the interpretation of "fighting" that Dawson's trial judge employed in the present case. Instead, *Hedgers* adopted the interpretation that Dawson proposes: the interpretation that "fighting" includes all instances where one person knowingly strikes another, even though the other person does not wish to fight and does not respond with force.

Given the underlying facts of Dawson's case, and given the fact that the primary dispute between the parties at Dawson's trial was whether Meyer suffered physical pain as a result of Dawson's striking him, it would appear that, under our decision in *Hedgers*, Dawson was indeed entitled to a jury instruction on the lesser offense of disorderly conduct.

■ However, for the reasons explained in this opinion, we conclude that we were mistaken in *Hedgers* when we declared that "fighting" does not require any degree of mutuality. We now hold that the phrase "engages in fighting" encompasses only those situations where the participants share a mutual purpose or understanding that they will trade blows or attempt to trade blows.

*The origins of subsection (a)(5) of our disorderly conduct statute*

The common law provided criminal penalties for direct assaults or batteries upon another person, but it also provided penalties for people who breached the public peace with violent, tumultuous, or otherwise disorderly conduct, even when that conduct did not constitute a punishable assault or battery.

If a group of people assembled *for the purpose* of engaging in violent or tumultuous behavior (and then engaged in that behavior), they were guilty of "riot". This offense (as generally defined) consisted of "planned and deliberate violent or tumultuous behavior involving a confederation of three or more persons".[2] Most American jurisdictions have enacted statutory versions of the offense of riot.[3]

A lesser common-law crime—"affray"—applied to breaches of the peace by people who had come together in a public place by chance or otherwise innocently, and then a quarrel arose which prompted them to engage in violent or tumultuous behavior. In such circumstances, the participants "[were] not guilty of riot, but of sudden affray only", because "[the] breach of the peace happened unexpectedly without any previous intention concerning it."[4] Affray was defined as "a mutual fight in a public place to the terror or alarm of [other] people".[5]

To constitute an "affray", the parties' intention or willingness to fight had to be mutual. If one person unlawfully attacked another, and the other person used force in an effort to defend himself, the instigator was guilty of assault and battery, while the other participant was entirely innocent of crime. In such circumstances, there was no affray.[6]

Moreover, with respect to both of these offenses—riot and affray—the gravamen of the offense was not any injury to persons or property that might ensue, but rather the present breach of the public peace and the attendant risk of terror or alarm that the violent or tumultuous behavior might cause.[7]

As is true with the offense of riot, most American jurisdictions have codified the com-

---

2. *Schlamp v. State*, 390 Md. 724, 891 A.2d 327, 332 (2006).

3. For example, the Carter Code (the earliest compilation of Alaska statutory law) defined "riot" as "any use of force or violence, or any threat to use force or violence, if accompanied by immediate power of execution, by three or more persons acting together and without authority of law". Thomas H. Carter, *Laws of Alaska* (1900), Part I (the Penal Code), § 111. This definition was later codified in 1949 Compiled Laws of Alaska § 65–10–1, and (following statehood) it was carried forward in former AS 11.45.020. Alaska's current riot statute is AS 11.61.100.

4. *Schlamp*, 891 A.2d at 332 (quoting William Hawkins, *A Treatise of the Pleas of the Crown* (8th ed. 1824), Vol. 1, p. 514). *Accord, State v. Kempf*, 26 Mo. 429, 1858 WL 5831, *1 (1858).

5. R. Perkins and R. Boyce, *Criminal Law* (3rd ed. 1982), p. 479.

6. *Ibid.*

7. *Id.* at 332–33.

mon-law crime of affray. Sometimes the codified crime is called "affray", but often state legislatures insert this offense into one of the provisions of their disorderly conduct statutes.[8] The Alaska territorial legislature took this latter approach: they enacted a disorderly conduct statute in 1935 which, among other things, prohibited "tumultuous conduct in any public place or private house to the disturbance or annoyance of any person".[9] 1949 Compiled Laws of Alaska, § 65–10–3.

Following statehood, this definition was carried forward in former AS 11.45.030, a statute entitled "Disorderly conduct and disturbance of the peace". As originally enacted (that is, before the 1973 amendments that we describe later), subsection (2) of this statute provided that a person committed disorderly conduct if they:

> [were] guilty of tumultuous conduct in a public place or private house to the disturbance or annoyance of another, or [were] otherwise guilty of disorderly conduct to the disturbance or annoyance of another[.]

We note that this statute was broader in scope than the common-law crime of affray, in that it applied to tumultuous or disorderly conduct not only in public places but also in private houses.

During the early days of Alaska statehood, various city governments also enacted disorderly conduct ordinances that covered the type of conduct which would have been an "affray" at common law. For example, the Anchorage disorderly conduct ordinance (in its 1970 version) declared, in pertinent part,

that it was unlawful "for any person[,] with purpose and intent[,] to cause public inconvenience, annoyance or alarm, or recklessly create a risk [of these things] by … [e]ngaging in fighting or threatening, or in violent or tumultuous behavior".[10]

But in 1972, in *Marks v. Anchorage,* 500 P.2d 644 (Alaska 1972), the Alaska Supreme Court ruled that this Anchorage ordinance was unconstitutional—and the supreme court's decision led to a complete revision of the *state* disorderly conduct statute.

In *Marks,* the supreme court concluded that the Anchorage disorderly conduct ordinance was unconstitutionally vague both in its prefatory language ("cause public inconvenience [or] annoyance") and in its use of the phrase "violent or tumultuous behavior". *Id.,* 500 P.2d at 645, 652–53. Although, technically speaking, the *Marks* decision dealt only with the Anchorage ordinance, the Alaska Legislature could see the writing on the wall, so they completely rewrote the state disorderly conduct statute the following year (1973).[11] (The Alaska Supreme Court indeed struck down the pre–1973 version of the state statute in *Poole v. State,* 524 P.2d 286, 289 (Alaska 1974).)

In the 1973 revision of AS 11.45.030, the phrases "tumultuous conduct in a public place or private house to the disturbance or annoyance of another" and "disorderly conduct to the disturbance or annoyance of another" were replaced by a series of more specific provisions. For purposes of the present discussion, the pertinent clause of

---

**8.** *See, e.g.,* Hawai'i Statute § 711–1101(1)(a), which declares that a person commits the offense of disorderly conduct "if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person … [e]ngages in fighting or threatening, or in violent or tumultuous behavior[.]"; Ohio Statute § 2917.11(A)(1), which declares that a person commits disorderly conduct if they "recklessly cause inconvenience, annoyance, or alarm to another by … [e]ngaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior[.]"; Montana Code § 45–8–101(1)(a), which defines disorderly conduct as "knowingly disturb[ing] the peace by … quarreling, challenging to fight, or fighting[.]"

*And see* Massachusetts General Laws, ch. 277, § 39, which defines "affray" as "[f]ighting to-

gether of two or more persons in a public place to the terror of the persons lawfully there."; New Mexico Statute § 30–20–2, which defines "public affray" as "two or more persons voluntarily or by agreement engaging in any fight or using any blows or violence toward each other in an angry or quarrelsome manner in any public place, to the disturbance of others."; Georgia Code § 16–11–32(a), which defines "affray" as "fighting by two or more persons in some public place to the disturbance of the public tranquility."

**9.** Laws 1935, ch. 72, § 1.

**10.** Quoted in *Marks v. Anchorage,* 500 P.2d 644, 645 (Alaska 1972).

**11.** *See State v. Martin,* 532 P.2d 316, 320 (Alaska 1975).

this revised, post–1973 version of the disorderly conduct statute is subsection (a)(3). This subsection declared that a person was guilty of disorderly conduct if "in a public or private place" [the person] "challenge[d] another to fight, or engage[d] in fighting other than in self-defense[.]"

In other words, subsection (a)(3) of the post–1973 disorderly conduct statute is the source of the language that is now found in subsection (a)(5) of our *current* disorderly conduct statute, AS 11.61.110—the statute that we must construe in this appeal.

*The treatment of fighting and other breaches of the peace under Alaska's current criminal code*

The Alaska criminal code was completely rewritten in the late 1970s. The drafters of the new criminal code proposed a series of three statutes (all of them contained in Title 11, chapter 61) to cover the general subject of conduct that threatens the peace. *See* Alaska Criminal Code Revision, Tentative Draft, Part 5 (1978), pp. 78–89. These three statutes were later enacted as AS 11.61.100, AS 11.61.110, and AS 11.61.120.

■ AS 11.61.100 defines the felony of "riot". Under this statute, a person commits riot "if, while participating with five or more others, the person engages in tumultuous and violent conduct in a public place and thereby causes, or creates a substantial risk of causing, damage to property or physical injury to a person." [12]

Moving down in degree of seriousness, AS 11.61.120 defines the misdemeanor of harassment. The pertinent portions of this statute are subsections (a)(1) and (a)(5), which declare that a person commits harassment if

the person "insults, taunts, or challenges another person in a manner likely to provoke an immediate violent response", or if the person "subjects another person to offensive physical contact".

The first clause of the statute is a codification of the common law. At common law, a person was chargeable with a breach of the peace if the person directed opprobrious or abusive language toward another person with the intent to incite the other person to violence, or under circumstances where the language was likely to provoke immediate violence.[13] The second clause of the statute was intended to cover minor shoves, slaps, or kicks that would not qualify as assaults under AS 11.41.200–230 because they do not inflict "physical injury". This latter clause was also intended to cover touchings of a sexual nature that would not qualify as sexual assaults or sexual abuse under AS 11.41.410–440.[14]

Finally, AS 11.61.110 defines the class B misdemeanor of "disorderly conduct". As we have already noted, the pertinent portion of this statute (for purposes of the present appeal) is subsection (a)(5), which declares that a person commits disorderly conduct if, "in a public or private place, the person challenges another to fight or engages in fighting other than in self-defense". This is simply a reiteration of subsection (a)(3) of the prior statute (as it was rewritten in 1973).[15]

Although disorderly conduct is designated a class B misdemeanor (a class of offense which normally carries a maximum penalty of 90 days' imprisonment),[16] the legislature has specified that the sentence of imprisonment for disorderly conduct can be no more than 10 days. *See* AS 11.61.110(c).

---

**12.** By design, this statute departs from the common-law definition in that it requires the joint participation of at least six people, it requires proof of a substantial risk of harm to persons or property, and it requires that the conduct be both tumultuous *and* violent. See the drafters' commentary to the riot statute: Alaska Criminal Code Revision, Tentative Draft, Part 5, pp. 82–84.

**13.** *See State v. Steger*, 94 W.Va. 576, 119 S.E. 682, 683–85 (1923); *Stewart v. State*, 4 Okla. Crim. 564, 109 P. 243, 245 (Okla.Crim.App. 1910); *State v. White*, 18 R.I. 473, 28 A. 968, 970

(1894). *See also State v. Morrison*, 46 Kan. 679, 27 P. 133, 134, 137 (1891).

**14.** *See* the legislative commentary to the harassment statute: 1978 Senate Journal Supp. No. 47 (June 12), pp. 96–97.

**15.** In their commentary to subsection (a)(5), the drafters noted simply that this subsection was "taken from existing AS 11.45.030". Alaska Criminal Code Revision, Tentative Draft, Part 5, p. 87.

**16.** *See* AS 12.55.135(b).

*Why we conclude that the phrase "engages in fighting other than in self-defense" requires proof of a mutual intention or willingness among the participants*

We now return to the issue of statutory interpretation presented in Dawson's case. Under AS 11.61.110(a)(5), a person commits disorderly conduct if the person "challenges another to fight or engages in fighting other than in self-defense". The question is whether the phrase "engages in fighting" encompasses any instance where one person strikes another—or whether this phrase applies only to situations where the parties share a mutual intention or understanding that they will exchange blows, or at least attempt to exchange blows.

As we have explained, this statutory language was formulated in 1973, when the legislature rewrote the disorderly conduct statute in response to the supreme court's decision in *Marks v. Anchorage*. At that time (*i.e.*, before the enactment of our current criminal code), Alaska law contained a separate statute—former AS 11.15.230—that punished all acts of assault and battery, including all instances where one person unlawfully struck another person.[17]

Former AS 11.15.230 declared that any person who unlawfully assaulted, threatened, or struck another person was guilty of a misdemeanor and subject to imprisonment for up to six months. As our supreme court noted in *Rivett v. State*, 578 P.2d 946, 948 (Alaska 1978), a person could commit assault and battery under this former statute by throwing "a simple punch [to] the nose, by means of a bare fist".

Because the crime of "assault and battery" as defined in former AS 11.15.230 already covered any act of unlawfully striking another person, the legislature must have intended to deal with a different social problem when, in 1973, they rewrote the disorderly conduct statute and included a subsection that prohibited "fighting other than in self-defense".

We believe that the legislature's intention is explained by the statutory history that we

recited in the preceding section of this opinion.

As we have already described, prior to the 1973 amendments prompted by *Marks v. Anchorage*, Alaska's disorderly conduct statute prohibited all "tumultuous conduct in a public place or private house to the disturbance or annoyance of another". This prohibition on "tumultuous conduct" was derived from the common-law crime of affray, which covered any sudden or unplanned breach of the peace by fighting or other tumultuous behavior.

But in *Marks*, the Alaska Supreme Court struck down a similarly worded municipal disorderly conduct ordinance—in part, because it employed the phrase "violent or tumultuous behavior". *Id.*, 500 P.2d at 645, 652–53. This prompted the Alaska Legislature to revise the state disorderly conduct statute by deleting the phrase "tumultuous conduct" and substituting more concrete definitions of the prohibited conduct. Among these more concrete definitions were "challeng[ing] another to fight" and "engag[ing] in fighting other than in self-defense".

Given the fact that this prohibition on "fighting" has its origins in the common-law offense of affray (which required a mutual intent or willingness to fight), and given the fact that a separate existing statute prohibited all batteries, one can infer that the legislature was describing situations of mutual fighting, rather than all situations where one person unlawfully strikes another.

This inference is strengthened by the fact that the phrase "engages in fighting" is immediately preceded by the phrase, "challenges another to fight". The act of "challenging" another to fight clearly involves daring or inviting someone else to engage in mutual fighting. And because this first clause of subsection (a)(5) employs the word "fight" in this sense of "mutual fighting", one can infer that the legislature was referring to the same concept—mutual fighting—when they used the phrase "engages in fighting" in the second clause of the statute.

17. *See* R. Perkins & R. Boyce, *Criminal Law* (3rd edition, 1982), p. 152. The authors explain that the common-law crime of battery encompassed all instances of "the unlawful application of force to the person of another", and that this "include[d] any application of force even though it entail[ed] no pain or bodily harm and le[ft] no mark".

Under the rule of statutory construction known as *noscitur a sociis* (literally, "it is known by its associates"), the meaning of a word in a statute can be gleaned from the words associated with it.[18] As a leading text on statutory construction explains,

> The principle of *noscitur a sociis* applies to sections and sentences in a manner similar to the application of the doctrine of *in pari materia* to [separate] statutes covering the same subject matter. . . . Where the meaning of a word is unclear in one part of a statute but clear in another part, the clear meaning can be imparted to the unclear usage on the assumption that [the word] means the same thing throughout the statute.

Norman J. Singer, *Sutherland's Statutes and Statutory Construction* (Seventh edition, 2007 revision), § 47.16, Vol. 2A, pp. 356–57.

Applying this principle to subsection (a)(5) of our disorderly conduct statute, we are led to conclude that the phrase "fighting other than in self-defense" refers to the same type of mutual fighting as the phrase "challenges another to fight". That is, both phrases refer to a physical struggle or combat among willing participants.

This conclusion is also bolstered by the disparity in the punishment for assault, and even the punishment for harassment, versus the punishment for disorderly conduct.

As we have explained, when the "fighting" provision of the disorderly conduct statute was first enacted in 1973, Alaska law had a separate statute punishing assault and battery (former AS 11.41.230). The maximum penalty for assault and battery under this former statute was 6 months' imprisonment.[19] When the legislature enacted the "fighting" provision of the disorderly conduct statute in 1973, the legislature also lowered the maximum penalty for disorderly conduct (which had previously been 6 months) down to 10 days in jail.[20]

Under Alaska's current criminal code, the least serious form of assault (fourth-degree assault) is a class A misdemeanor, carrying a maximum penalty of 1 year's imprisonment.[21] Second-degree harassment, which covers "insults, taunts, or challenges ... [that are] likely to provoke an immediate violent response", as well as acts of "offensive physical contact", is a class B misdemeanor with a maximum penalty of 90 days' imprisonment.[22] But the maximum penalty for disorderly conduct is still 10 days' imprisonment; *see* AS 11.61.110(c).

The fact that a person who is found guilty of disorderly conduct for "engaging in fighting other than in self-defense" faces such a minimal penalty compared to the sentences that can be imposed for assault or even harassment suggests to us that the legislature viewed disorderly conduct as a significantly lesser offense. But this view of disorderly conduct would make little sense if "fighting" included all instances where one person unlawfully strikes or offensively touches another person. The disparity in punishment suggests that the legislature took a narrower view of "fighting"—the view that "fighting" referred to instances of fighting between mutually willing participants.

If the legislature viewed "fighting" in this more limited sense, then it would be reasonable for the legislature to impose greater punishments for assault and for harassment (which includes non-consensual offensive touchings, as well as "insults, taunts, and

---

18. *See Smith v. State*, 229 P.3d 221, 227 n. 4 (Alaska App.2010); Garner, *Black's Law Dictionary* (Eighth ed. 2004), p. 1087.

19. *See* former AS 11.15.230.

20. Compare the pre–1973 version of former AS 11.45.030, which stated that the offense of disorderly conduct "[was] punishable ... by imprisonment in a jail for not more than six months", and the post–1973 version of the statute, former AS 11.45.030(b), which stated that the offense "[was] punishable ... by imprisonment for not more than 10 days".

21. *See* AS 11.41.230(b) (classifying fourth-degree assault as a class A misdemeanor) and AS 12.55.135(a) (declaring that the maximum penalty for a class A misdemeanor is 1 year in prison).

22. *See* AS 11.61.120(b) (classifying second-degree harassment as a class B misdemeanor) and AS 12.55.135(b) (declaring that the maximum penalty for a class B misdemeanor is 90 days in prison).

challenges" that are likely to provoke immediate violence). When an assault leads to combat, it will be a combat where one participant is at fault and the other participant is exercising the right of self-defense. And when harassment leads to combat, it will be a combat where one participant is significantly more at fault than the other. In cases of mutual "fighting", on the other hand, there is no primary offender or victim; this conduct is punished only because the turmoil of the fight could breach or threaten the public peace.

This interpretation of the word "fighting"—that it implies a degree of mutuality that the terms "beating" and "assault" do not—is consistent with the Alaska Supreme Court's treatment of this word in *Des Jardins v. State*, 551 P.2d 181 (Alaska 1976).

The defendant in *Des Jardins* was convicted of negligent homicide for beating and killing a man in a fight that ensued after the man kicked the side of Des Jardins's vehicle.[23] On appeal, he argued that his jury should have been instructed on the doctrine of "excusable homicide" under former AS 11.15.110. This statute provided that an accidental death was an "excusable" homicide (*i.e.*, a non-punishable homicide) if the death occurred "upon a sudden combat, without premeditation or undue advantage being taken, and without a dangerous weapon or thing being used, and not done in a cruel and unusual manner."[24]

In the court's discussion of why this statute did not apply to the facts of Des Jardins's case, the supreme court used the word "fight" as a synonym for the statutory phrase "sudden combat", and the court clearly viewed the word "fight" as connoting mutuality:

> AS 11.15.110 is intended to protect the person who kills another by accident in a fair and weaponless fight. The encounter between [the victim] and Des Jardins cannot be described as a fight. [The victim] was already on the ground when Des Jardins approached him, and there is no evidence to show that he offered any resistance to the blows being administered by

Des Jardins with the instrument he was seen to have had in his hand.

*Des Jardins*, 551 P.2d at 189.

Other jurisdictions have also construed the word "fighting" to require some degree of mutual willingness to fight. Although there is not a lot of appellate authority directly on point, we have not found any cases (other than our own prior decision in *Hedgers*) where a court construed the phrase "engages in fighting" to encompass a one-sided assault or battery.

In *City of Stoughton v. Powers*, 264 Wis. 582, 60 N.W.2d 405 (1953), the Wisconsin Supreme Court rejected a vagueness attack on a disorderly conduct ordinance which prohibited "any fighting". The court ruled that "fighting" meant voluntary participation in physical combat. In reaching this conclusion, the court relied in part on a North Carolina case from 1875, construing the common-law offense of affray:

> "Fighting," the act prohibited by the ordinance, has a common and ordinary meaning sufficiently definite to be understood with reasonable certainty by persons of ordinary intelligence. That common and ordinary meaning is well expressed in the old axiom that "It takes two to fight."

> "Fight" has been defined as a combat between two persons suggesting primarily the notion of a brawl or unpremeditated encounter; as an altercation for which the participant is in some degree to blame and in which he is, to some extent at least, a voluntary participant, and not that which is unavoidable and beyond his control, or which has not been occasioned by any improper conduct on his part. In *State v. Gladden*, 1875, 73 N.C. 150 [1875 WL 2798], [when] pointing out the necessity of a mutual intent in fighting, the court said that it is not necessary that both parties should give and take blows; [but] that it [was necessary] that both parties put their bodies in a position to give and take blows, and *with that intent*.

---

23. *Des Jardins*, 551 P.2d at 183–84.

24. Quoted in *Des Jardins*, 551 P.2d at 189 n. 20.

*City of Stoughton,* 60 N.W.2d at 407 (emphasis in the original) (citations omitted).

The Oregon Court of Appeals reached the same conclusion (requiring a mutuality of intention) in *Adams v. Oregon State Penitentiary,* 20 Or.App. 244, 531 P.2d 754, 756 (1975). And in *Parker v. Kelly,* 140 A.D.2d 993, 529 N.Y.S.2d 662 (1988), a New York appeals court held that there was insufficient evidence to sustain the defendant's conviction for "engag[ing] in fighting" with another inmate, where the record revealed that the defendant was attacked by another inmate and merely pushed him away. *Id.* at 663.

For these reasons, we conclude that the phrase "engages in fighting other than in self-defense" (as used in subsection (a)(5) of our disorderly conduct statute) does not include one-sided attacks of one person upon another—*i.e.,* acts punishable as assault, or acts punishable as harassment under AS 11.61.120(a)(5) (subjecting another person to offensive physical contact). Rather, the phrase "engages in fighting other than in self-defense" is limited to altercations where the parties share a mutual intent or willingness to fight.

█ It is possible that in some cases where a defendant is charged with assault, the evidence may give rise to a reasonable possibility that the defendant is not guilty of assault but rather of the lesser crime of disorderly conduct under the "engages in fighting" clause of AS 11.61.110(a)(5). It is also possible that the evidence may give rise to a reasonable possibility that the defendant is guilty of the lesser crime of harassment under either AS 11.61.120(a)(1) (insulting, taunting, or challenging another person in a manner likely to provoke an immediate violent response) or AS 11.61.120(a)(5) (subjecting another person to offensive physical contact).

█ If the government has not already charged these lesser crimes as alternative offenses, and if the evidence presented at trial is sufficient to support the conclusion that the defendant is not guilty of assault but is instead guilty of one or (conceivably) both of these lesser offenses, then either party may request a jury verdict on these lesser offenses.[25] In such cases, the jurors should be instructed that they can not return a verdict on a lesser offense unless they have reached unanimous agreement that the defendant should be acquitted of the charged assault.[26]

*Dawson's alternative arguments as to why she was entitled to a jury instruction on disorderly conduct or some other lesser offense*

█ Dawson argues that even if the "engages in fighting" clause of the disorderly conduct statute requires a mutuality of purpose on the part of both participants, the evidence in her case satisfied this criterion. Dawson points out that there was evidence that the victim, Patrick Meyer, was angry with her, that he denigrated her in front of their children, and that he pulled the ignition fuse out of her vehicle. Based on this evidence, Dawson argues that the jury could have found that Meyer likewise wished to "engage in fighting".

█ We reject this argument for two reasons. First, even though Dawson's trial attorney suggested this theory to the trial judge, Dawson did not present this argument on appeal until she filed her reply brief during the initial round of briefing. Second, even assuming that the jury believed that Meyer became angry with Dawson, criticized her, and pulled the ignition fuse from her vehicle, these acts did not constitute "fighting" for purposes of the disorderly conduct statute.

**25.** *See Heaps v. State,* 30 P.3d 109, 115 (Alaska App.2001) ("Prior Alaska [appellate] decisions have construed [Alaska Criminal] Rule 30(b) to require a trial judge to instruct the jury on a lesser included offense when the lesser offense is supported by the evidence and either the defendant or the State asks for the instruction."); *Bendle v. State,* 583 P.2d 840, 843–44 (Alaska 1978) (defense request); *Blackhurst v. State,* 721 P.2d 645, 649–650 (Alaska App.1986) (prosecution request).

**26.** *Edwards v. State,* 158 P.3d 847, 855 (Alaska App.2007); *Dresnek v. State,* 697 P.2d 1059, 1060–64 (Alaska App.1985), *affirmed* 718 P.2d 156 (Alaska 1986).

True, we often refer to couples as "fighting" when they engage in heated verbal arguments, but the disorderly conduct statute uses the word "fighting" in the sense of physical combat. There is no indication that Meyer "fought" with Dawson in this sense, nor is there is any indication that he intended to challenge Dawson to engage in physical combat with him when he directed the angry words at her or when he pulled out the ignition fuse.

We accordingly uphold the trial judge's ruling that, under the facts of Dawson's case, Dawson was not entitled to a jury instruction on disorderly conduct as defined in subsection (a)(5) of AS 11.61.110.

■ In her supplemental brief to this Court, Dawson argues that if we conclude that disorderly conduct (under the "engages in fighting" clause of the statute) was not a proper lesser offense in her case, we should nevertheless grant Dawson a new trial, so that she would have the opportunity to propose some other lesser offense. Dawson argues that this would be the fair thing to do because, at the time of her trial, this Court's decision in *Hedgers* was the sole appellate decision on this point of law, and yet the trial judge did not follow *Hedgers*.

We find this argument unconvincing for two reasons. First, one of the main reasons the trial judge did not follow *Hedgers* is that no one brought *Hedgers* to her attention. In fact, even in the original round of briefing in this appeal, nobody mentioned *Hedgers* until Dawson filed her reply brief.

Second, after Dawson's trial judge ruled that the "engages in fighting" clause of the disorderly conduct statute required proof of a mutual fight, or at least a mutual purpose to fight, nothing prevented Dawson's attorney from proposing some other lesser offense.

Dawson argues that even if her trial attorney proposed an incorrect lesser offense, the fact that the request was made should have been enough to put the trial judge on notice that the jury had to be instructed on *some* lesser offense if Dawson's trial was to be fair. Again, we do not agree.

The only issue actively disputed at Dawson's trial was whether Dawson's act of striking Meyer caused him physical pain. The jury was told that it was the State's burden to prove this element beyond a reasonable doubt, so the jury instructions plainly allowed both parties to argue their respective theories of the case.

Dawson contends that the jury needed to have some sort of lesser offense as an alternative choice, because Dawson admitted that she struck Meyer and threw the baking pan at him, and thus the jury would want to convict her of something. But when Meyer took the stand, he downplayed the seriousness of Dawson's actions, and he denied that Dawson had caused him physical pain. Under these circumstances, we believe that the jurors would have had little difficulty in voting to acquit Dawson if they believed that the State had failed to prove that Dawson was guilty of assault.

*Dawson's claim of error concerning the jury instruction dealing with the evidence of her prior wrongful act*

Dawson raises one other point on appeal; she claims that the jury was misinstructed concerning evidence that she had attacked Meyer on a prior occasion.

■ At trial, over Dawson's objection, the judge allowed the prosecutor to introduce evidence that Dawson had struck Meyer once before, using a metal TV tray. The trial judge ruled that evidence of this prior incident was admissible under Alaska Evidence Rule 404(b)(4)—a rule that applies when a defendant is on trial for a crime of domestic violence, and which authorizes the admission of evidence concerning the defendant's other crimes of domestic violence.

Regarding the evidence of Dawson's prior attack on Meyer, the judge instructed the jurors that they were authorized to consider this prior incident "as circumstantial evidence that [Dawson] acted true to character during the episode being litigated". The judge then added, "You should weigh [this evidence] in the same manner as ... all other evidence in the case", and "[you should] give it the weight, if any, to which you find it entitled".

In our prior decision in this case—*Dawson v. State*, Alaska App. Memorandum Opinion No. 5580 (March 31, 2010), 2010 WL 1256326—we declared that it was a "close question" whether the trial judge should have admitted evidence of this prior incident under Evidence Rule 404(b)(4). We acknowledged that the prior incident "clearly qualified for admission" under Rule 404(b)(4), since it was a prior incident of domestic violence committed by Dawson.[27] However, we questioned whether this prior incident was truly relevant to any contested issue at Dawson's trial.[28] We noted that, at trial, Dawson did not dispute hitting Meyer with her fists and with the baking pan. The only disputed issue was whether Dawson's conduct caused Meyer physical pain—and, on that issue, Dawson's prior attack had no apparent relevance.[29]

Dawson argues that if this evidence should not have been admitted under Evidence Rule 404(b)(4), then it was error for the trial judge to instruct the jurors that they could view this evidence as circumstantial evidence that Dawson "acted true to character during the episode being litigated"—*i.e.*, as circumstantial evidence that she struck Meyer on the present occasion, as she had in the past.

If it was error to admit this evidence under Rule 404(b)(4), then Dawson is correct that the jury should not have been allowed to treat the prior incident as circumstantial evidence that Dawson struck Meyer on the present occasion. But it is difficult to see how Dawson was prejudiced by this jury instruction—because, as we just explained, Dawson conceded that she struck Meyer on the present occasion. (Dawson does not claim that she adopted this trial strategy on account of the trial judge's evidentiary ruling).

Dawson argues that the prejudice of this instruction was compounded by the second portion of the instruction, in which the judge told the jurors, "You should weigh [the evidence of Dawson's prior attack on Meyer] in the same manner as . . . all other evidence in the case[, and you should] give it the weight, if any, to which you find it entitled". Dawson contends that this second portion of the instruction, even standing alone, constitutes reversible error.

■ Dawson's argument is based on what this Court said about other crimes evidence in *Bingaman v. State*, 76 P.3d 398 (Alaska App.2003). In *Bingaman*, we held that evidence of a defendant's other wrongful acts admitted under Evidence Rule 404(b)(4) could properly be used as character evidence,[30] but we also stated that trial judges should caution jurors that it is improper to convict a defendant based solely on the defendant's past misdeeds:

> Because of the danger posed by proving a defendant's character through evidence of specific acts, we conclude that . . . when the trial judge decides to allow the State to introduce evidence under [Evidence] Rules 404(b)(2), (b)(3), or (b)(4), the judge must instruct the jury that evidence of the defendant's other acts is never sufficient, standing alone, to justify the defendant's conviction. The jury must understand that it is the government's burden to prove beyond a reasonable doubt that the defendant committed the crime currently charged—and that this can not be done simply by showing that the defendant has committed similar acts in the past.

*Bingaman*, 76 P.3d at 416–17.

Dawson contends that the second portion of the jury instruction violated this aspect of our decision in *Bingaman*. She argues that, because the instruction authorized the jurors to give the evidence of her prior attack on Meyer "the weight . . . to which [the jurors found] it entitled", the instruction implicitly authorized the jurors to give this evidence *decisive* weight. That is, Dawson argues that the instruction implicitly allowed the jurors to convict Dawson of the present assault even if the jurors disbelieved all of the prosecution's other evidence, and even if they concluded that this prior incident was the *only* credible evidence of Dawson's guilt.

**27.** 2010 WL 1256326 at *3.

**28.** *Ibid.*

**29.** *Ibid.*

**30.** *Bingaman*, 76 P.3d at 401, 408.

As Dawson correctly points out, *Bingaman* holds that a defendant can not be convicted of a crime of domestic violence based solely on circumstantial proof of their propensity for domestic violence (as demonstrated by their past acts of domestic violence). But the challenged instruction does not say otherwise. Rather, the potential flaw in the instruction is what it does *not* say.

Generally speaking, it is always up to the jury to decide what evidence is credible, and to assess the weight that should be given to any particular piece of evidence. In that regard, the challenged jury instruction is unexceptional. The instruction's weakness is one of omission: it failed to expressly inform the jurors that they should not convict Dawson of assaulting Meyer if there was no credible evidence that she committed the assault, apart from the fact that she had attacked him before.

The ultimate question is whether the record of Dawson's trial indicates that this flaw in the instruction appreciably affected the jury's verdict.[31]

Dawson's jury was instructed that, before Dawson could be convicted of fourth-degree assault, the State had to prove beyond a reasonable doubt that she recklessly caused physical injury to Meyer on August 7, 2007—that is, on the occasion being litigated, and not on some earlier occasion.

The testimony regarding the prior TV tray incident was brief. Meyer testified that, during the previous year, Dawson hit him in the back with a TV tray. The police were called, but the police laughed when they were told what had happened, and they did not arrest Dawson, but rather asked her to leave the house and let tempers cool.

On cross-examination by Dawson's attorney, Meyer said that the TV tray was made of flimsy metal, less substantial than a child's lunch box, and that the tray folded in half when Dawson hit him with it. Meyer said that the blow made him angry, but he was not physically hurt.

During closing arguments, the prosecutor made only passing reference to this prior incident, and Dawson's attorney did not mention it at all.

Perhaps more importantly, Dawson conceded at trial that she hit Meyer on the evening in question in this case—that is, the evening of August 7, 2007. The only disputed issue was whether Dawson caused Meyer pain when she hit him-or, stated somewhat differently, whether Meyer testified truthfully when he declared that he did not feel any pain from the blows.

The evidence of Dawson's prior attack on Meyer, and the accompanying inference that Dawson had a propensity to hit Meyer with household objects, was not particularly relevant on this disputed issue of whether Meyer suffered pain when he was struck on the evening of August 7, 2007. There was other, much more relevant evidence on the question of whether Meyer was being truthful when he denied that Dawson's blows had caused him pain.

On the night of the charged incident, Meyer told the 911 operator that he had been assaulted, and when a police officer asked Meyer if he was hurt, Meyer replied, "Fuck, yeah." When the officers arrived on the scene, Dawson was intoxicated, loud, angry, crying, and still yelling at Meyer. She told an officer that she had "cracked [Meyer] upside the head with a pan to shut him up." When the officer asked Dawson how hard she hit Meyer, Dawson replied, "You can still hear him talking, so I must not have hit him hard enough."

Moreover, when Meyer took the stand at Dawson's trial (as a State's witness), he repeatedly asserted that he did not remember the events of that evening. Meyer was so uncooperative with the prosecutor that the trial judge eventually declared him to be a hostile witness.

Given this record, we conclude that the jury's verdict was not appreciably influenced by the evidence that Dawson had attacked Meyer on an earlier occasion, nor was the

---

**31.** *Evans v. State,* 574 P.2d 24, 25–26 (Alaska 1978); *Love v. State,* 457 P.2d 622, 631–32 (Alaska 1969).

verdict appreciably influenced by the flaws in the jury instruction that Dawson challenges in this appeal.

*Conclusion*

The judgement of the district court is AFFIRMED.

COATS, Chief Judge, concurring.

COATS, Chief Judge, concurring.

I agree with the opinion of the court that Judge Illsley did not err in refusing to instruct Dawson's jury on the lesser included offense of disorderly conduct. But I disagree with the court's departure from our former decision in *Hedgers v. State.*[1] I also disagree with the court's interpretation of AS 11.61.110(a)(5), the subsection of the disorderly conduct statute that makes it unlawful to "engage in fighting other than in self-defense."

The *Hedgers* case arose from an altercation in a parking lot. Christina Hedgers became upset with Sony Schibalski because of Schibalski's cautious driving. Hedgers yelled obscenities at Schibalski (apparently after she delayed turning left from the Parks Highway into a supermarket parking lot). Schibalski then approached Hedgers's parked car and challenged her behavior. Hedgers "yelled more obscenities at Schibalski, bumped her in the chest, and kicked Schibalski's leg with her knee."[2] Hedgers was ultimately charged with disorderly conduct for "engaging in fighting other than in self-defense."

In a court trial before District Court Judge Peter G. Ashman, Hedgers argued that her conduct did not meet the definition of "fighting" in the disorderly conduct statute. She also argued that her use of force was justified in self-defense. Judge Ashman rejected both arguments. He then convicted Hedgers of disorderly conduct.

On appeal, Hedgers renewed her claim that her conduct did not fall within the defi-

nition of "engaging in fighting other than in self-defense." She argued that this definition of fighting required proof of "mutual, pugilistic combat." A majority of this court disagreed. We explained:

> [T]he common usage of fighting is "to take part in a physical struggle or battle[.]" This definition is not as narrow as the definition promoted by Hedgers. And Hedgers's definition would exclude those "fights" that are one-sided due to choice, surprise by the aggressor, or simply the superior ability of a participant.[3]

It seems clear to me that *Hedgers* was correctly decided. *Hedgers* involved a minor altercation in a parking lot. It is not entirely clear, but it appears that Schibalski parked her car near Hedgers, perhaps confining her, and confronted Hedgers about her behavior.[4] At trial, Hedgers defended primarily on the ground that she struck Schibalski in self-defense. But Hedgers argued in the alternative that there was no fight.[5] I do not believe the legislature intended a defendant to be acquitted in this circumstance if the State failed to prove that the parties shared a mutual intent to fight.

I agree with the majority that the legislature intended this subsection of the disorderly conduct statute to criminalize fighting in situations in which the government could not prove assault because the parties willingly agreed to mutual combat. But, as demonstrated by the facts of *Hedgers*, just because the legislature intended to criminalize mutual combat does not mean it intended to limit the offense to situations where the State could prove mutual fighting.

It will often be extremely difficult to prove that an altercation involved a mutual fight. Does it matter who started the altercation? Would it make a difference if the victim fought back or just tried to keep from being hit? The plain language of the disorderly conduct statute appears to answer these questions. If you engage in a fight, including

1. Mem. Op. & J. No. 4056, 1999 WL 349062 (Alaska App. June 2, 1999).

2. *Id.* at *1.

3. *Id.*

4. *Id.* at *1–2.

5. *Id.*

a fight in which both parties are willing participants, you are guilty of disorderly conduct unless you acted in self-defense. This court had it right in *Hedgers*. The definition of "fighting" does not "exclude those 'fights' that are one-sided due to choice, surprise by the aggressor, or simply the superior ability of a participant." [6]

I agree, however, with the court's resolution in the present case. Ginnie Dawson was charged with assault in the fourth degree for hitting her husband, Patrick Meyer, with her fists and throwing a baking pan at him, "recklessly causing physical injury to [Meyer]." At trial, Dawson conceded that she struck Meyer, but Meyer testified that he suffered no pain from the assault. Dawson's attorney asked Judge Illsley to instruct the jury on the lesser offense of disorderly conduct for "engag[ing] in fighting other than in self-defense."

**6.** *Id.* at *1.

Judge Illsley refused to instruct the jury on disorderly conduct because there was no evidence that Meyer responded to Dawson's assault. She concluded that there was no evidence of a fight. Judge Illsley had seen the evidence in the case and she concluded that there was no evidence of an altercation. Furthermore, she could have concluded that the jurors might have been confused by an instruction requiring them to find that there was some sort of fight when there was no evidence of a fight. I therefore agree with the opinion of the court that Judge Illsley did not err in refusing to instruct the jury on the lesser offense of disorderly conduct.